RIPPLE, Circuit Judge.
This case grows out of the reorganization of the Chicago, Rock Island and Pacific Railroad Company (Rock Island) that has been supervised by the District Court for the Northern District of Illinois. Texas North Western Railway Company (TNW) filed a petition in the district court seeking declaratory and injunctive relief with respect to trackage rights it allegedly acquired from Rock Island’s successor, the Chicago Pacific Company (CPC). The dispute centers on a Trackage Rights Agreement between Rock Island and the Atchi-son, Topeka and Santa Fe Railway Company (Santa Fe). CPC assigned Rock Island’s interest in the Agreement to TNW in 1985. TNW appeals from an order of the district court granting summary judgment to Santa Fe and denying summary judgment to TNW. The court held that TNW had no rights under the Agreement because the Agreement had been terminated earlier by Santa Fe. It also held that a later compromise of claims did not negate that termination and that prior bankruptcy orders of the district court did not restrain termination of the Agreement. We affirm.
Analysis
On appeal, TNW presents two arguments in support of its contention that the judgment of the district court ought to be reversed. First, it submits that the district court erred in its determination that Santa Fe terminated Rock Island’s trackage rights. Second, it submits that, in any event, Orders No. 1, 248, and 297 of the *269 reorganization court prevented Santa Fe from undertaking such a termination. We shall discuss each of these contentions separately.
A. Failure to Terminate Properly the Trackage Rights
The 1971 Trackage Rights Agreement between Rock Island and Santa Fe granted Rock Island the right to operate trains on 63.6 miles of Santa Fe track between Etter and Amarillo, Texas. In return, Rock Island was to pay Santa Fe a specified fee per mile for use of the track. The Agreement also included a termination clause. Section 18 provided:
If Rock Island shall fail to pay any sum payable by it hereunder on the date when the same shall be due ... and such default shall continue for a period of sixty (60) days after written demand for such payment ... shall have been made upon Rock Island by Santa Fe, then Santa Fe shall have and is hereby given the right, at its election, to declare this agreement terminated, and, after giving notice in writing of such election to Rock Island, this agreement then and there and by such notice shall be terminated____
R. 9, Ex. 1 at 20; R. 15, Ex. 1 at 20. The Agreement also provided that, in the event of Rock Island’s bankruptcy, Santa Fe’s termination rights would be preserved, subject to the requirement that the written demand for payment and notice of termination be given to the bankruptcy trustee as well as Rock Island. Id. at 21.
In 1979, Rock Island defaulted on its payments. Santa Fe presented written demands for payment on several occasions in 1979, but payment was never received. See Appellant’s Br. at 6; Appellee’s Br. at 5. These demands were addressed to Rock Island’s Auditor of Disbursements. R. 15, Exs. 2-4. Rock Island had filed a petition in bankruptcy in 1975, and William Gibbons had been appointed as trustee. Mr. Gibbons occupied the president’s office in Rock Island headquarters in Chicago, and in 1979 he personally assumed the duties of the president and supervised the railroad’s staff. The addresses of Rock Island and its trustee were identical, and the same individuals received the mail. See In re Chicago, R.I. & P.R.R., No. 75 B 2697, mem. op. at 4 (N.D.Ill. Dec. 22,1987) [available on WESTLAW, 1987 WL 31307] [hereinafter Mem. op.]; R.21 at 4; Appellee’s Br. at 6. On October 21, 1980, Santa Fe notified Mr. Gibbons of its termination of the Trackage Rights Agreement due to Rock Island’s default. The notice was addressed to Mr. Gibbons, “Trustee, Chicago, Rock Island and Pacific Railroad Company,” at the railroad’s Chicago headquarters. Santa Fe maintains that service of this notice upon Mr. Gibbons effectively terminated the Agreement.
Rock Island’s rights under the Agreement were purportedly assigned to TNW in 1985 by Rock Island’s successor, CPC. However, when TNW attempted to operate over the Etter-Amarillo line, Santa Fe refused it access. Santa Fe maintained that the agreement had been terminated by the default in 1980 and, therefore, the 1985 assignment transferred no trackage rights over the Etter-Amarillo line to TNW.
TNW argues that the district court erroneously concluded that Santa Fe had terminated Rock Island’s trackage rights over the Etter-Amarillo line. TNW does not dispute that Rock Island was in default under the Agreement. However, TNW does maintain that Santa Fe’s purported termination of the Agreement was ineffective because Santa Fe failed to comply with the demand and notice requirements of section 18 of the Agreement. While Santa Fe did send written demands for payment to Rock Island, it did not send separate demands to the Rock Island trustee. In addition, Santa Fe’s notice of termination was sent only to the trustee. Separate written notice was not sent to Rock Island. Because section 18 requires that, if there is a bankruptcy trustee, written demand for payment and notice of termination shall be given to the trustee and Rock Island, TNW asserts that Santa Fe failed to comply with the terms of the Agreement when exercis *270 ing its right to terminate.[1]
We believe that Santa Fe did effectively terminate the Agreement. The district court properly noted that, under the circumstances of this bankruptcy and reorganization, Santa Fe provided notice of termination to the only relevant entity in existence in' October 1980. Mem. op. at 4. The district court ordered the Rock Island trustee to cease efforts at reorganization and to begin liquidation in January 1980, and, on June 2,1980, the system-wide abandonment of the Rock Island lines was ordered. See In re Chicago Pac. Corp., 773 F.2d 909, 911 (7th Cir.1985). Thus, in the wake of these orders, no debtor railroad remained. See Mem. op. at 4. Since no separate Rock Island entity existed in October 1980 upon which Santa Fe could have served notice of its election to terminate the Agreement, Santa Fe did provide proper notice of termination under section 18 of the Agreement.
Santa Fe’s failure to send separate copies of the demands for payment to the trustee did not constitute a breach of the terms of the Agreement. Section 22 of the Agreement provides that it “shall be construed liberally so as to secure to each party all of the rights, privileges and benefits herein provided or manifestly intended.” R.9, Ex. 1 at 22; R.15, Ex. 1 at 22. Santa Fe’s actions were not inconsistent with the intent of the parties as manifested in the Agreement. It is clear that, under section 18, Santa Fe was to retain its right to terminate the Agreement in the event of Rock Island’s bankruptcy,[2] so long as it complied with the dual notice requirements of that section. The notice requirements presumably were included in the Agreement so that, in the event of a Rock Island bankruptcy, both the trustee and the railroad would know of any default under, or decision by Santa Fe to terminate, the Trackage Rights Agreement. See Appel-lee’s Br. at 9. Santa Fe’s actions did not compromise this intent. At the time of Santa Fe’s notice, the trustee personally performed the duties of the railroad president. All mail, whether it was addressed to the trustee or the railroad, was routed to the same office. Therefore, the trustee and Rock Island did receive actual written notice of the railroad’s default in payment. The terms of the Agreement do not require more. TNW’s assertion that demand and notice must be served on both Rock Island and its trustee, see Appellant’s Reply Br. at 1, is unsupported by the terms of the Agreement itself and inconsistent with the mandate of section 22 that the Agreement be construed liberally. We conclude, therefore, that Santa Fe’s actions did effectively terminate the Trackage Rights Agreement.
TNW next argues that a compromise of claims between Santa Fe and the trustee negated Santa Fe’s previous election to terminate the Trackage Rights Agreement. On November 30, 1983, the Rock Island trustee and Santa Fe entered into a settlement agreement that mutually discharged all outstanding monetary claims. See R.9, Ex. 8. However, the dispute as to the trustee’s right to assign the trackage rights over the Etter-Amarillo line was specifically excluded from this compromise of claims. The agreement stated that, “[t]he mutual release set out in this Agreement shall not affect and specifically excludes the [trackage rights] dispute which shall be determined at a future date by the Reorganization Court.” Id. TNW *271 notes that the settlement agreement resolved all monetary claims that Santa Fe may have had against Rock Island. This resolution included the monetary claims against Rock Island that are the basis of its alleged default under the Trackage Rights Agreement. TNW concludes, therefore, that, since Santa Fe has settled the payment disputes underlying its election to terminate the Agreement, it has also relinquished any right to claim that the termination itself was effective. TNW asserts that the settlement agreement excluded from its terms only the issue of the assignment of Rock Island’s rights under the Trackage Rights Agreement. It did not, however, exclude disputes regarding Rock Island’s failure to pay its past due debts.
TNW’s interpretation of the settlement agreement is logically inconsistent; it renders the exclusion provision meaningless. The settlement agreement specifically excluded the assignment dispute from that agreement’s mutual release and discharge of outstanding claims. Yet any dispute over Rock Island’s purported assignment of its trackage rights is based on Rock Island’s failure to pay its trackage rights charges and Santa Fe’s earlier election to terminate the Agreement based on those defaults. It would make little sense for Santa Fe specifically to preserve its right to contest the assignment issue and at the same time deny itself the right to rely on the default-based termination argument that is the source of the assignment dispute. Therefore, the district court was correct in concluding that the entire trackage dispute was specifically exempted from the settlement agreement.
In addition, Santa Fe’s termination of the Trackage Rights Agreement took place in 1980. The settlement agreement was reached in 1983. While Santa Fe can no longer insist on payment of the past-due trackage rights charges, Rock Island’s failure to pay those charges within 60 days of their becoming due still constituted a default giving rise to Santa Fe’s right to terminate the Trackage Rights Agreement. Although the debts themselves were discharged by the 1983 settlement, the defaults still occurred and justified Santa Fe’s election to terminate the Agreement.
B. Effect of the Bankruptcy Orders of the District Court
TNW next argues that three of the bankruptcy orders entered by the district court restrained Santa Fe from terminating the Trackage Rights Agreement. It maintains that Orders No. 1, 248, and 297 contained injunctive language restraining unilateral interference with Rock Island’s rail interests, including its trackage rights over the Etter-Amarillo line.[3] TNW asserts that this “injunctive proscription” prohibited Santa Fe from taking any action affecting Rock Island’s trackage rights without first obtaining the approval of the district court. Because Santa Fe failed to petition the court for approval prior to terminating the Trackage Rights Agreement, that termination is ineffective. The district court, however, held that its orders did not prevent Santa Fe from exercising its termination rights. See Mem. op. at 7. We agree.
The district court held that Santa Fe’s election to terminate the Agreement was not subject to any stay resulting from either Order No. 248 or Order No. 297. Id. Order No. 248 mandated the abandonment of Rock Island rail lines and the discontinuance of all rail services. This abandonment had been recommended by the Interstate Commerce Commission in its May 23, 1980 report. See R.9, Ex. 5 at 33; R.15, Ex. 5 at 33. The order, however, also directed the trustee to retain for 180 days those rail lines designated in Appendix D to the ICC Report. R.9, Ex. 4; R.15, Ex. 6. The Etter-Amarillo trackage was not listed in that appendix. Therefore, the district *272 court concluded that the Rock Island-Santa Fe Trackage Rights Agreement was not subject to the Order No. 248 stay. Order No. 297 decreed that “until the Court’s further order, all persons, firms or entities are restrained from physically or otherwise interfering with ... [the] rail interests” of Rock Island. R.17, Ex. C. This order, however, was entered on December 1,1980. Because Order No. 297 was entered after Santa Fe sent written notice of its election to terminate the Agreement in October 1980, the district court held that Order No. 297 did not apply in this case.
We agree with the district court’s interpretation of Orders No. 248 and 297. That court is in the best position to interpret its own orders. We will not reverse a district court’s interpretation of its own order “unless the record clearly shows an abuse of discretion.” Arenson v. Chicago Mercantile Exch., 520 F.2d 722, 725 (7th Cir.1975). We have applied this principle in the railroad reorganization context, stating that “[t]he district court best knows the meaning of its own orders. The meaning of these documents is reasonably clear; even if it were not, we would defer to the district court’s construction of them.” In re Chicago, M. St. P. & P.R.R., 784 F.2d 831, 834-35 (7th Cir.1986). The meaning of the orders in the case at hand is similarly clear and the district court’s interpretation of them is reasonable.
Order No. 1, entered on March 17, 1975, contained injunctive language similar to that found in Order No. 297.[4] TNW argues that this order also restrained Santa Fe from terminating the Agreement. The district court, however, noted that this order did not prevent the termination of Rock Island contracts under general principles of contract law. See Mem. op. at 7. Therefore, this order did not prevent Santa Fe from exercising its right of termination under the Trackage Rights Agreement. A trustee in bankruptcy takes the debtor’s contracts cum onere, that is, subject to existing burdens. “[A] trustee cannot accept the benefits of an executory contract without accepting the burdens as well.” Schokbeton Indus. v. Schokbeton Prods. Corp., 466 F.2d 171, 175 (5th Cir.1972).[5] Thus, the Rock Island trustee assumed the railroad’s contracts subject to any limitations contained in those contracts. In this case, Rock Island’s interest under the Trackage Rights Agreement was subject to Santa Fe’s existing right to terminate that contract.[6] Therefore, Santa Fe’s exercise of its right to terminate was not an interference with Rock Island’s interests precluded by Order No. 1. Rather, Rock Island’s contract interest itself was always, and continued to be, subject to the termination provision.
Conclusion
The judgment of the district court granting Santa Fe’s motion for summary judgment and denying that of TNW is affirmed. Santa Fe did effectively terminate the Trackage Rights Agreement under section 18, and this termination was not negated by the 1983 compromise of claims between Santa Fe and the Rock Island trustee. In addition, Santa Fe’s termination of the Agreement was not restrained by any of the bankruptcy orders of the district court.
AFFIRMED.

. TNW also argues that Santa Fe’s termination was ineffective since it was based on an improper reason: abandonment. The Agreement expressly disallowed reliance on abandonment as a proper basis for termination. See R.9, Ex. 1 at 20 ("it being understood and agreed that non-use of the Joint Facilities by Rock Island shall not constitute default under this agreement”). This argument must be rejected. The termination letter sent to the trustee by Santa Fe clearly specified default as a ground for termination. See R.9, Ex. 11 (“The purpose of this letter is to confirm the termination of the aforementioned contract as of June 2, 1980, by reason of Rock Island’s abandonment of trackage rights and default under the contract.”) (emphasis supplied).

. “If the railroad of Rock Island shall at any time be held or operated by any receiver or trustee, Santa Fe shall have the right ... to terminate this agreement for any default on the part of Rock Island to the same extent and in the same manner as if such receivership or trusteeship did not exist____’’ R.9, Ex. 1 at 21.

. Order No. 1, entered on March 17, 1975, restrained interference with Rock Island's interests as of the date Rock Island’s reorganization petition was approved. R.9, Ex. 3 at 11-12. Order No. 248, entered on June 2, 1980, mandated the abandonment of Rock Island’s rail lines and directed the trustee to preserve designated lines for sale as operating rail properties. R.9, Ex. 4. Order No. 297, entered on December 1, 1980, extended indefinitely the restraining language of Order No. 1. R.17, Ex. C.

. "All persons and all firms and corporations ... hereby are restrained and enjoined from interfering with ... interests, railroads, properties or premises belonging to, or in the possession of the Debtor____” R.9, Ex. 3 at 12.

. "The trustee succeeds only to such rights as the bankrupt possessed; and the trustee is subject to all claims and defenses which might have been asserted against the bankrupt but for the filing of the petition.” Schokbeton, 466 F.2d at 175 n. 7 (quoting Bank of Marin v. England, 385 U.S. 99, 101, 87 S.Ct. 274, 276, 17 L.Ed.2d 197 (1966) (emphasis in Schokbeton)).

. Schokbeton, 466 F.2d at 175 (a trustees adoption of the debtor s contract does not pre-elude the exercise of the other party s pre-exist-mg right to terminate the agreement”).